**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-7227

WILLIE JAMES DEAN, JR.,

Plaintiff – Appellant,

v.

JOHNNIE JONES; CHARLES C. HOBGOOD,

Defendants – Appellees,

and

GEORGE T. SOLOMON; CARLTON JOYNER; S. WADDELL,

Defendants.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Louise W. Flanagan, District Judge.  (5:16-ct-03109-FL)

Argued:  September 9, 2020                    Decided:  January 4, 2021

Before GREGORY, Chief Judge, and WYNN and HARRIS, Circuit Judges.

Reversed and remanded by published opinion.  Judge Harris wrote the opinion, in which Chief Judge Gregory and Judge Wynn joined.

**ARGUED:** Jehanne McCullough, Virginia Oat, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant.  Mary Carla Babb, Special Deputy

Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. **ON BRIEF:** James S. Ballenger, Molly M. Cain, Third Year Law Student, Read W. Mills, Third Year Law Student, Appellate Litigation Clinic, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant. Joshua H. Stein, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

———————

PAMELA HARRIS, Circuit Judge:

This appeal arises from two uses of force against a North Carolina prison inmate, Willie James Dean, Jr., by correctional officers. In the first, according to Dean, after he head-butted an officer escorting him to his cell, the officer retaliated by pepper-spraying his face while he was subdued and lying on his back in handcuffs. And soon afterwards, Dean attests, a second officer responded to a second head-butt by pushing Dean into a closet where multiple officers kicked and punched him while he lay on the ground with his hands cuffed behind him.

Dean sued, alleging excessive force under the Eighth Amendment, and the district court granted summary judgment to the officers. Even if Dean was handcuffed and prone when he was pepper-sprayed or beaten, the court held, a reasonable jury would have to conclude that both uses of force were necessary to protect officer safety and proportionate to the threat posed by Dean. It therefore was beyond dispute, the court reasoned, that the officers had applied force only to ensure safety and maintain order and not for any impermissible purpose.

We disagree. As the district court recognized, the Eighth Amendment excessive force inquiry turns on motive: Here, whether the officers used force in good faith to protect officer safety, as they contend, or whether, as Dean avers, they used force maliciously to punish Dean for his head-butts. Viewing the record in the light most favorable to Dean, as we must at the summary judgment stage, we do not think this question can be answered in the officers' favor as a matter of law. A reasonable jury crediting Dean's account could find that the officers used force not to protect themselves but to retaliate against Dean, in

3

violation of the Eighth Amendment. Accordingly, we reverse the grant of summary judgment.

## I.

### A.

This appeal concerns two uses of force against Dean by correctional officers Charles Hobgood and Johnnie Jones on December 12, 2015, while Dean was serving a prison sentence at Central Prison in Raleigh, North Carolina. Soundless video footage from the prison captures some of the surrounding events but does not show either use of force itself. The parties dispute many of the critical facts, and those disputes are noted below.

We begin with the first incident, which occurred while Officer Hobgood was escorting Dean back to his cell after a visit to the prison barber. During that walk, Dean concedes, he head-butted Officer Hobgood, "causing him to fall." J.A. 110.[1] According to Dean, he promptly was subdued by a second officer, Dustin Gipson, who arrived on the scene. Dean ended up lying on his back with his arms handcuffed beneath him, while Officer Gipson, on top of him, pressed his knees into Dean's chest. At that point, Dean attests – while he was restrained by Officer Gipson and non-resistant – Officer Hobgood got to his feet and "administered one long burst [of pepper spray] to [Dean's] face, lasting over 3 seconds" and "partially blind[ing]" him. J.A. 111, 113.

---

[1] In his initial witness statement, Dean attributed his actions to a PTSD-caused episode.

4

Officer Hobgood's account differs in critical respects. In Officer Hobgood's telling, Dean resisted Officer Gipson's efforts to subdue him, and although Gipson was able to control Dean's "upper body," the two then fell to the floor together with Dean continuing to struggle. J.A. 38. It was only after he saw Dean resisting on the ground, Officer Hobgood claims, that he administered a single burst of pepper spray to Dean's face.

The second episode began after twelve other correctional officers arrived on the scene in response to a call for backup. Two of those officers – one of whom was Sergeant Jones – held onto Dean's handcuffed wrists and began escorting him toward a nurses' station for decontamination. These events are captured by video, which shows 11 other officers following closely behind the group of three.

According to Dean, during this escort, Sergeant Jones twice pushed him into sliding doors without provocation; one of those incidents can be seen on the video. As the escort continued, Dean states, he "fear[ed] for his well being," panicked, and head-butted Sergeant Jones's face. J.A. 113. The video shows Sergeant Jones, surrounded at this point by 10 other officers, responding by pushing Dean up against a nearby wall. And then, on Dean's account, Sergeant Jones told the other officers to "get him in there," J.A. 114, and the officers pushed Dean into a nearby janitor's supply closet, out of range of the video camera.

Dean, still handcuffed, landed on the closet floor and there, he claims, he was "maliciously beaten by . . . Jones and other officers." J.A. 115. As the punching and kicking continued, Dean avers, he tried to "curl up to protect himself," but the officers

5

"grabbed his legs" to make that impossible. J.A. 115. And according to Dean, Sergeant Jones repeatedly shouted at him, "You done fucked up!" during the beating. J.A. 115.

Sergeant Jones disputes important elements of this account. According to Jones, he and another officer placed Dean against the wall near the janitor's closet to restrain him after the head-butt. Dean and the two officers ended up in the closet by accident; Dean, in handcuffs against the wall, continued to resist and then the group's "collective momentum" caused them to fall into a nearby closet. J.A. 25. Injuries to Dean's face likewise were the result of an accident: After the group stumbled into the closet together, Dean "struck the right side of his head on a protruding shelf and his face on the concrete floor." J.A. 25. Because Dean continued to struggle, Jones claims, he and another officer applied a bent-wrist technique to restrain him. But according to Jones, Dean was not punched, kicked, or otherwise beaten.

Finally, there is the video footage of the hallway outside the closet. Dean was in the closet for just over a minute, while several officers stood outside its door. Those officers pulled boxes out of the closet while Dean was inside, and one can be seen making a kicking motion near the door. At another point, Dean's shoe can be seen flying out of the closet before being kicked aside by an officer. In the end, Dean can be seen, as he attests, being "tossed on the floor" outside the closet with a bloodied face. J.A. 116.

Dean's injuries were severe. The discharge instructions from Wake Medical Center, where he was treated, state that Dean suffered a "contusion of face," an "abrasion of face," a "closed fracture of nasal bone," and "subconjunctival hematoma." J.A. 124. Weeks after the incident, Dean could not see anything out of his left eye. He later underwent surgery

6

to excise a sinus cyst that developed near his nasal fracture. When he filed the complaint in this action, Dean still was suffering from blurred vision, dizzy spells, and light sensitivity, among other ailments.

**B.**

Dean, proceeding pro se, filed a § 1983 action against Officer Hobgood and Sergeant Jones, alleging that they used excessive force against him in violation of the Eighth Amendment.[2] After discovery, the defendants moved for summary judgment. Dean could not prevail on his Eighth Amendment claim, they argued, because they applied force permissibly in order to protect their safety after being head-butted by Dean, and no reasonable jury could find otherwise. And even if there had been an Eighth Amendment violation, according to the officers, they were entitled to qualified immunity because that violation was not "clearly established" in 2015.

The district court agreed with the officers on the merits, holding that Dean could not establish an Eighth Amendment violation as a matter of law. As the court recognized, Dean's Eighth Amendment excessive force claim turned on whether the officers applied force with a "sufficiently culpable state of mind" – that is, maliciously and in order to inflict pain, and not for a permissible reason like the protection of officer safety. *Dean v. Jones*, No. 5:16-CT-3109-FL, 2018 WL 4655723, at *3 (E.D.N.C. Sept. 27, 2018) (citation omitted). To analyze the officers' motives, the court applied the so-called *Whitley* factors,

---

[2] Dean also sued three prison supervisors. The district court dismissed those claims at an early stage of the litigation, finding that Dean failed to allege facts establishing supervisory liability. Dean has not appealed that ruling.

7

which include the need for force, the proportionality of the force used, and any threat to officer safety. *Id.* (citing *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

With respect to Officer Hobgood's use of pepper spray, the district court adopted Dean's basic account, as required on summary judgment, which had Dean on the ground in handcuffs and non-resistant at the time the pepper spray was deployed. Even so, the court held, Hobgood's use of force was clearly necessary – and no reasonable jury could find otherwise – because it came "almost immediately after" Dean's head-butt, when Hobgood still "reasonably feared for his own and officer Gipson's safety." *Id.* at *4. Similarly, assuming for purposes of summary judgment that Sergeant Jones kicked and punched Dean while he was handcuffed on the floor of the supply closet, no reasonable jury could find that Jones had acted in anything but good faith: Jones, like Hobgood, "applied force immediately after [Dean] head butted him," and all of "the officers reasonably feared for their safety." *Id.*

Dean timely appealed the district court's grant of summary judgment to the defendants.

## II.

Now represented by pro bono counsel, Dean argues that the district court misapplied the summary judgment standard, failing to construe the record evidence in the light most favorable to Dean as the nonmoving party. Properly viewed, he claims, the record would support a jury finding that Officer Hobgood and Sergeant Jones violated the Eighth Amendment by using force not to protect themselves from a handcuffed and subdued

8

inmate, but in retaliation for Dean's prior intransigence. We agree with Dean. And we further conclude that if the officers maliciously used force against Dean after any threat to officer safety had passed, then they violated Eighth Amendment law that was "clearly established" at the time. We therefore reverse the judgment of the district court.

**A.**

The district court granted summary judgment to the officers on the merits of Dean's excessive force claim, finding as a matter of law that the officers had used force for the permissible purpose of protecting officer safety. We review that award of summary judgment de novo. *Brooks v. Johnson*, 924 F.3d 104, 111 (4th Cir. 2019).

A court may "grant summary judgment only if, taking the facts in the best light for the nonmoving party, no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003). In other words, we, like the district court, must review the facts in the light most favorable to Dean, drawing all reasonable inferences in his favor. *Brooks*, 924 F.3d at 111. If the record, so viewed, gives rise to genuine factual disputes about why Officer Hobgood and Sergeant Jones deployed force in the way they did, then those questions must be resolved by a jury, not on summary judgment. *Id.* at 111–12. A dispute is "genuine" for these purposes so long as a reasonable jury could resolve it in Dean's favor. *See Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (internal quotation marks omitted).

1.

The legal standard that governs Dean's Eighth Amendment excessive force claim is clear. An inmate's claim of excessive force involves both an objective and a subjective component. The objective component measures the nature of the force employed, asking whether that force "was sufficiently serious to establish a cause of action." *Brooks*, 942 F.3d at 112. This is not a high bar; de minimis or trivial force is not enough, but anything more will suffice. *Id.*

The more demanding part of the test – and the one on which the district court appropriately focused – is the subjective component, which asks a single question: whether the officers acted with a "sufficiently culpable state of mind." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). As the district court explained, the state of mind required here is "wantonness in the infliction of pain." *Dean*, 2018 WL 4655723, at *3 (internal quotation marks omitted); *see Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008) (quoting *Whitley*, 475 U.S. at 322). Whether an inmate can establish that impermissible motive turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted).

As we have explained, officers employ force in "good faith" – and thus permissibly – when they are motivated by an "immediate risk[] to physical safety" or threat to prison order. *Brooks*, 924 F.3d at 113. But they cross the line into an impermissible motive when they inflict pain not to protect safety or prison discipline but to punish or retaliate against an inmate for his prior conduct. *Id.*; *see Boone v. Stallings*, 583 F. App'x 174, 177 (4th Cir. 2014) ("[T]he Eighth Amendment does not permit a correctional officer to respond to

10

a misbehaving inmate in kind."). And the use of force on an inmate who is "restrained and compliant and posing no physical threat" raises the specter of such an impermissible motive. *Thompson v. Virginia*, 878 F.3d 89, 102 (4th Cir. 2017).

On summary judgment, then, the inquiry under the subjective component boils down to whether a reasonable jury could determine that an officer acted with malice, applying force punitively and "for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted); *see Williams*, 77 F.3d at 765. Because direct evidence of motive or intent may be hard to come by, the Supreme Court in *Whitley v. Albers* set out four factors from which "we may infer the existence of th[e] subjective state of mind required for an Eighth Amendment violation." *Brooks*, 924 F.3d at 116 (alteration in original) (internal quotation marks omitted). Those factors are:

> (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) "any efforts made to temper the severity of a forceful response."

*Iko*, 535 F.3d at 239 (quoting *Whitley*, 475 U.S. at 321). If a reasonable jury could find, based on inferences drawn under the *Whitley* factors or other evidence, that correctional officers used force maliciously to punish or retaliate against an inmate, then summary judgment is not appropriate. *See Brooks*, 924 F.3d at 116.

2.

We begin with Officer Hobgood's use of pepper spray against Dean while Dean was lying on the ground with his hands cuffed behind him. Consistent with the legal standard described above, Officer Hobgood raises two arguments in defense of the district court's

grant of summary judgment. Hobgood first argues that Dean has failed to establish a sufficiently serious use of force under the Eighth Amendment's objective component, primarily because officers sought to decontaminate Dean's eyes after the pepper-spraying. And in any event, Hobgood argues, Dean cannot satisfy the subjective component, because any reasonable jury would have to find that Hobgood used force only to protect officer safety in the wake of Dean's head-butt, and not "maliciously" to punish Dean. We disagree on both points.

We need address the objective component only briefly here. The district court suggested that Dean fell short on this score because he had not shown injuries from the pepper spray that "rise above the level of de minimis harm." *See Dean*, 2018 WL 4655723, at *4. But as Hobgood acknowledges on appeal, that is the wrong question: Although we once considered the severity of an inmate's *injuries* under the objective component, the Supreme Court has clarified that what matters is the severity of the *force* employed. *See Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010). So long as the force used is more than de minimis, the objective component is satisfied, regardless of the extent of the injury. *See id.*; *Hill v. Crum*, 727 F.3d 312, 316 (4th Cir. 2013) ("[T]here is no *de minimis* injury threshold for an excessive force claim . . . ."); *Thompson*, 878 F.3d at 98 ("[A] prisoner who suffers a minor, but malicious, injury may be able to prevail on an excessive force claim . . . .").

Under the correct standard, we have no difficulty concluding – as we have before – that a reasonable jury could find that a sustained blast of pepper spray directly to the face constitutes something more than de minimis force. *See Greene v. Feaster*, 733 F. App'x

12

80, 81–82 (4th Cir. 2018) (per curiam) (holding that use of pepper spray for "two to three seconds" is sufficient to make out excessive force claim); *cf. Iko*, 535 F.3d at 238–39 (holding that extensive use of pepper spray may satisfy prior version of the objective prong). Officer Hobgood argues that because the officers intended to decontaminate Dean's eyes after the fact, his use of force becomes de minimis. We disagree. What happens *after* force is employed – whether and what kind of treatment is provided – may bear on the extent of an inmate's *injuries*, but it will not affect the nature of the force itself. And as we have explained, it is the force itself that is the focus of the objective component. *See Thompson*, 878 F.3d at 100.[3]

That brings us to the subjective component, and whether Officer Hobgood used force in a "good faith effort" to subdue Dean and protect officer safety or "maliciously" to punish Dean. *See Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted). Applying the first three *Whitley* factors – the need for force, the proportionality of the force

---

[3] Officer Hobgood also suggests that even if Dean can satisfy the objective component, Dean's failure to establish significant injury would bar the recovery of compensatory damages under 42 U.S.C. § 1983. Because Hobgood did not make that argument below, it is forfeited on appeal. *See Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 242 (4th Cir. 2009). What damages would be available were Dean to prevail at trial is something we may leave for the district court on remand. We note, however, that what is required for compensatory damages under § 1983 is no more than "actual injury," *see Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 (1986); and that Dean, who described himself as "partially blinded" in the aftermath of the pepper-spraying, has presented evidence of injury to his eyes that includes damaged blood vessels and persistent vision problems. J.A. 113, 117-19. On this record, we think it likely that a reasonable jury could infer that the pepper-spraying, as opposed to the episode in the supply closet, caused at least some portion of those injuries.

used, and any threats to officer safety – the district court held that only one inference could be drawn as a matter of law:  Officer Hobgood pepper-sprayed Dean because he feared for officer safety, and thus acted with a permissible motive.  *See Dean*, 2018 WL 4655723, at *4.[4]  On appeal, Hobgood echoes the district court, arguing that his use of force was so evidently necessary and proportional under the *Whitley* factors that no reasonable jury could infer a malicious motive.

The problem with this analysis is that whether Hobgood's use of pepper spray was "clearly necessary" to respond to a threat to officer safety, *id.*, turns on material questions of fact that are sharply disputed by the parties.  On Officer Hobgood's account, to be sure, the pepper spray was necessary to protect against the threat posed by a resistant Dean, still largely unsubdued and grappling on the ground with Officer Gipson at the time force was used.  But we must view the record in the light most favorable to Dean, and Dean's account has him fully subdued and non-resistant, lying on his back with handcuffed arms beneath him and Officer Gipson kneeling on his chest, when Hobgood pepper-sprayed his face.  A

---

[4] The district court found that the fourth *Whitley* factor – efforts made to temper the severity of a forceful response – did not favor Officer Hobgood, *see Dean*, 2018 WL 4655723, at *4, and on this point, we agree.  Whether other officers sought to decontaminate Dean's eyes after the pepper-spraying has no bearing on whether *Hobgood* tempered his response, and it is Hobgood's state of mind that is at issue.  Hobgood also points to a Department of Public Safety policy identifying pepper spray as the "approved and recommended minimum" use of force, noting that compliance with a use-of-force policy would be "highly relevant" under this *Whitley* factor.  *See Brooks*, 924 F.3d at 122.  But whether Hobgood in fact complied with that policy – which does not permit the use of force to punish – is precisely the material dispute that forecloses summary judgment, as we explain below.  *See Williams*, 77 F.3d at 766 (finding that "critical flaw" in reliance on use-of-force policy is that compliance is "hotly disputed").

reasonable jury crediting Dean could draw a different inference from the *Whitley* factors: that the need for force to protect safety and order was *not* so "self-evident" that it excluded the possibility of a malicious motive. *See Brooks*, 924 F.3d at 116.

As we have explained, it is "well-established . . . that officers may not use gratuitous force against a prisoner who has already been subdued . . . [or] incapacitated." *See Thompson*, 878 F.3d at 104 (alterations in original) (internal quotation marks omitted). And when officers do use force – including pepper spray – against a formerly recalcitrant inmate *after* he has been subdued, then a reasonable jury may infer that the force was applied not for protective reasons but instead to retaliate or punish. *See Iko*, 535 F.3d at 239–40 (holding that deployment of pepper spray after inmate is lying on the floor restrained may give rise to inference that force was not employed protectively); *see also Brooks*, 924 F.3d at 116 (holding that improper motive could be inferred in part from fact that inmate was subjected to taser shocks while "handcuffed and surrounded by officers"). We applied those straightforward principles in exactly this context in *Boone v. Stallings*, 583 F. App'x at 176, reversing a grant of summary judgment to correctional officers because there was a factual dispute as to whether the plaintiff inmate was handcuffed before or after he was pepper-sprayed. If "a jury were to believe Boone's allegation that he was on the ground, already restrained in handcuffs" when the pepper spray was deployed, we held, then it reasonably could conclude that the officers used force punitively and not protectively, subjecting Boone to "unconstitutionally excessive force." *Id.* The same is true here. Viewing the record facts in the light most favorable to Dean, a reasonable jury

15

could find that he was pepper-sprayed only after any threat to safety had passed, and from that infer an impermissible retaliatory motive under *Whitley*.[5]

In reaching a contrary conclusion, the district court appears to have made two mistakes. First, it seems to have found, as a matter of law, that Dean remained a threat to Officers Gipson and Hobgood while he was lying on his back in handcuffs. And that was so, the court reasoned, because even on Dean's account of the episode, though Officer Gipson was attempting to hold Dean's knees to his chest, Dean's legs were unrestrained. *Dean*, 2018 WL 4655723, at \*4. But that misunderstands Dean's sworn Statement of Material Facts, in which Dean describes a different scene: Dean is lying on his back with his cuffed arms beneath him and Officer Gipson on top of him, with *Officer Gipson*'s knees driven into Dean's chest. And a jury crediting *that* account could find that Dean was entirely restrained when he was pepper-sprayed, posing no threat to any officer by way of legs or otherwise.

Second and more fundamentally, the district court erred to the extent it suggested that a jury would be required to deem Officer Hobgood's use of pepper spray "necessary" and proportionate so long as it came "almost immediately after" Dean's head-butt. *Id.* We appreciate that the decision to use force often involves "split-second judgments" made

---

[5] Our decision in *Grayson v. Peed*, 195 F.3d 692 (4th Cir. 1999), on which the officers and the district court heavily rely, is not to the contrary. In *Grayson*, we affirmed a grant of summary judgment to defendant officers in an excessive force case because the plaintiff's own account established that force was used in order to subdue him. *Id.* at 696. There was no allegation in *Grayson*, as there is here, that the officers used force *after* the plaintiff already had been restrained. *See id.*; *see also Iko*, 535 F.3d at 240 n.11 (distinguishing *Grayson* on this ground).

under tense and difficult circumstances, *id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)), and that "due deference" is owed to correctional officers' efforts to protect their own and others' safety, *Grayson*, 195 F.3d at 697. But we also have made clear that the justification for using protective force expires at the very moment a threat is neutralized. Once Dean was subdued and Officer Hobgood no longer had reason to fear for officer or public safety, the use of force became unnecessary and unjustified – even if all of that transpired merely seconds after Dean head-butted Hobgood. *See*, *e.g.*, *Harris v. Pittman*, 927 F.3d 266, 274 (4th Cir. 2019) ("[T]he reasonableness of force employed can turn on a change of circumstances during an encounter lasting only a few seconds." (internal quotation marks omitted)); *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) ("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."). Again, we have applied this well-established principle to facts much like those presented here, holding that a jury may infer an impermissible retaliatory motive when a correctional officer assaults an inmate very shortly after the inmate "deliver[s] a roundhouse kick to [the officer's] neck," if the inmate by then has been wrestled to the floor and subdued. *Mann v. Failey*, 578 F. App'x 267, 270, 275 (4th Cir. 2014) (per curiam).

In sum, on this record viewed most favorably to Dean, the inferences to be drawn from the *Whitley* factors are "not so plain that they may be resolved as a matter of law" on summary judgment. *Brooks*, 924 F.3d at 117. We of course do not opine on how an ultimate fact-finder might evaluate the parties' differing accounts, or weigh the necessity and proportionality of Officer Hobgood's use of force. But a reasonable jury crediting

17

Dean's version of events could infer under *Whitley* that force was used not to protect officer safety but instead to retaliate against Dean for his head-butt, and for that reason, Officer Hobgood is not entitled to summary judgment on the merits of Dean's Eighth Amendment claim.

3.

We turn now to Dean's excessive force claim against Sergeant Jones, arising from the use of force inside the janitor's closet. That incident left Dean with multiple serious injuries, and Jones does not dispute that the Eighth Amendment's objective component is satisfied. Sergeant Jones argues and the district court held, however, that Dean cannot establish, as a matter of law, the culpable state of mind required by the subjective component: Under the *Whitley* factors, the force applied in the closet was made necessary by and proportionate to the threat Dean posed to officer safety, foreclosing any inference of an improper motive. *See Dean*, 2018 WL 4655723, at *4–5.

We disagree. In granting summary judgment to Sergeant Jones, the district court made two mistakes. First, in applying the *Whitley* factors, the court failed to view the record in the light most favorable to Dean, and instead drew inferences in Sergeant Jones's favor while overlooking inconsistencies in his account. And second, the court entirely disregarded direct evidence of malicious intent, in the form of Dean's testimony regarding statements made by Jones during the closet episode. When all the evidence is considered, and considered in the light most favorable to Dean – as it must be at the summary judgment stage – there is enough for a reasonable jury to find that what motivated Sergeant Jones

18

was an impermissible intent to retaliate rather than a need to protect officer safety and prison order.

a.

In applying the *Whitley* factors, the district court found, as Sergeant Jones argues on appeal, that there was a "clear need for the application of force" against Dean because Jones "and the other officers" in the closet with Dean "reasonably feared for their safety." *Dean*, 2018 WL 4655723, at *4. But according to Dean, he was completely restrained and not resisting after he was pushed into the closet, lying on the floor with his hands still cuffed behind his back and trying to "curl up to protect himself" as he was punched and kicked repeatedly by numerous officers. J.A. 115. And as explained above, a jury crediting that account reasonably could infer that the multiple officers confronting a handcuffed Dean in the supply closet in fact did not fear for their safety but instead intended to punish Dean for his intransigence. *See*, *e.g.*, *Mann*, 578 F. App'x at 275 (continued assault on formerly resistant inmate after he has been subdued gives rise to inference of malice under *Whitley*).

The district court did not confront directly Dean's account or its implications for the *Whitley* analysis, instead dismissing as "conclusory" Dean's sworn and detailed attestation that he was non-resistant and fully subdued during his beating. *Dean*, 2018 WL 4655723, at *5. It did suggest that the officers might have "interpreted" Dean's efforts to protect himself by curling his legs as "attempts to kick them," necessitating a forceful response. *Id.* But none of the officers in the closet asserted in their initial witness statements that Dean attempted to kick them, and the district court was not authorized, at the summary

19

judgment stage, to draw its own inferences about what they believed – inferences that favor Jones, rather than Dean. *See*, *e.g.*, *Brooks*, 924 F.3d at 111 (explaining that all reasonable inferences must be drawn in favor of plaintiff inmate when defendant officers move for summary judgment). And to the extent the district court again suggested that any use of force would qualify as "necessary" under *Whitley* so long as it came "almost immediately after" a threat to officer safety – here, Dean's head-butt of Jones, *see Dean*, 2018 WL 4655723, at *4–5 – it was again mistaken, for the reasons we already have described. *See*, *e.g.*, *Waterman*, 393 F.3d at 481 (force initially justified becomes unreasonable as soon as threat has passed).

The district court's analysis of *Whitley*'s proportionality factor is similarly flawed. On Sergeant Jones's account, of course, the only force deployed was a "bent-wrist technique" designed to restrain Dean, J.A. 19, which might be deemed proportionate to the circumstances Jones describes. But on Dean's account, the force in question consisted of a serious beating after he was restrained, administered by multiple officers who kicked and punched him until he nearly blacked out. Even assuming some need to administer force at the time, a reasonable jury crediting Dean – and perhaps considering that Dean was at all times in handcuffs and substantially outnumbered by the officers surrounding him – could find that the extent of the force was so disproportionate to any genuine threat that it must have resulted from an impermissible retaliatory motive. The district court suggested that the officers "reasonably believed" that lesser force in the form of pepper spray "would not be effective," given that Dean continued to resist by head-butting Sergeant Jones even after the initial pepper-spraying. *See Dean*, 2018 WL 4655723, at *4. But the record is silent

20

as to any such belief by any of the officers involved, so this, too, is an inference improperly drawn against Dean and in favor of Jones on summary judgment. And we can find no support for the district court's suggestion that the beating described by Dean was "proportionate" as a matter of law because the officers brought it to an end after a minute. *See id.* at \*5 ("The officers also removed [Dean] from the janitor's closet approximately one minute after the incident began, which does not suggest defendants used a disproportionate amount of force under the circumstances.").

Finally, the district court did not address the record evidence that could allow a reasonable jury to credit all or part of Dean's account, rather than Sergeant Jones's, in applying the *Whitley* factors. For instance, Sergeant Jones's description of how he, Dean, and another officer accidentally fell into the janitor's closet is consistent with only some of the officers' witness statements; all told, there seem to be six versions of who ended up in the closet and how, differing in respects both relatively minor (how many officers accidentally fell into the closet with Dean, *see* J.A. 43) and more significant (whether Dean fell into the closet or was "placed" there by Sergeant Jones, *see* J.A. 50). What's more, a jury could view the video evidence as resolving this discrepancy in Dean's favor: Taken in the light most favorable to Dean, the video can be construed to show Jones and other officers holding Dean against the wall for a moment and then forcefully and intentionally pushing him into the closet. And while Sergeant Jones denies that Dean was punched or kicked once in the closet, the video clearly shows an officer making a kicking motion inside the closet doorframe, and one of Dean's shoes flying out of the closet. Lastly, while Jones

21

asserts that Dean injured his face when he fell and hit the right side of his head on a closet shelf, Dean's most serious injuries are to the left side of his face.

Again, we have no occasion here to anticipate how a fact-finder ultimately might assess the credibility of Dean's account, or what inferences about motive it might draw from the *Whitley* factors as applied to all the record evidence. But those are jury questions, inappropriate for resolution on summary judgment. *See Wilson v. Prince George's County*, 893 F.3d 213, 218 (4th Cir. 2018) (reiterating that court does not "weigh the evidence or make credibility determinations" in reviewing grant of summary judgment). On this record, we cannot say that the *Whitley* factors establish, as a matter of law, that Sergeant Jones acted with a permissible motive when he applied force against Dean in the janitor's closet.

b.

The district court erred in a second respect, as well, in analyzing the merits of Dean's excessive force claim against Sergeant Jones: It never addressed Dean's direct evidence that Jones acted with an impermissible retaliatory motive. In his sworn statement, Dean attests that Jones first told the other officers to "get him [Dean] in there" as Dean was pushed into the janitor's closet, and then repeatedly shouted, "You done fucked up!" to Dean as the officers beat him. J.A. 114–15. According to Dean, that evidence, properly credited as required at the summary judgment stage, *see Brooks*, 924 F.3d at 115, would permit a trier of fact to conclude that Jones acted with the requisite "malicious" motive under the Eighth Amendment. We agree.

22

The district court gave no reason for its failure to consider this evidence. On appeal, however, Sergeant Jones supplies an explanation, arguing that the alleged statements are of limited import, at best: An inmate can satisfy the Eighth Amendment subjective component, Jones contends, only if the *Whitley* factors lead to an inference of malice, rendering any other evidence largely immaterial. But that justification for ignoring Dean's direct evidence will not work, because it misunderstands the nature and function of the *Whitley* factors.

The crucial question under the Eighth Amendment's subjective component is one of motive: whether the officer acted "in a good faith effort" to protect safety or maintain discipline, or "maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted). The *Whitley* factors provide one "non-exclusive" way to interrogate that question, *Thompson*, 878 F.3d at 99, allowing a fact-finder to infer a malicious state of mind when no legitimate purpose for a use of force is readily apparent. *See Brooks*, 924 F.3d at 116 ("Even without direct evidence of malicious intent, that is, we may infer the existence of the subjective state of mind required for an Eighth Amendment violation from the *Whitley* factors."). But nothing about *Whitley* – or any other case – suggests that an officer's intent may not be proven directly or through other circumstantial evidence as well, when such evidence is available. On the contrary, we have relied heavily on non-*Whitley* record evidence – including a correctional officer's statements – in finding that an officer's motive for using force is a triable issue of fact. *See id.* at 114–16 (reversing summary judgment to correctional officers because non-*Whitley* evidence – including officer statements – would allow a jury to find that force was used

23

with punitive intent); *Mann*, 578 F. App'x at 275 (holding that "malicious intent could be readily inferred" from correctional officer's statement to inmate before and while using force).

The officers' suggestion that motive may be evaluated only through the lens of the *Whitley* factors is fundamentally incompatible with the nature of an Eighth Amendment violation. "The point of [the *Whitley*] analysis," we have explained, is to provide objective benchmarks to measure whether a use of force was "reasonably related to a legitimate nonpunitive" governmental interest or could "plausibly have been thought necessary" by the officers in question. *Brooks*, 924 F.3d at 116 (internal quotation marks omitted). If so, then that will tend to exclude an impermissibly punitive motive; if not, then such a motive may be inferred. *Id.* But the ultimate question remains subjective, not objective – "not whether a reasonable officer *could* have used force" for a legitimate reason," as per *Whitley*, but "whether these particular officers *did* use force for that reason." *Id.* at 113. So whatever the outcome of the *Whitley* analysis, other evidence of an impermissible malicious motive, direct or circumstantial, always will be relevant to the Eighth Amendment inquiry.

Recognizing our case law relying on such evidence in Eighth Amendment cases, Sergeant Jones raises an alternative argument. Even if officer statements could prove or help to prove malicious intent, he contends, his alleged statements here do not: Shouting "You done fucked up" at Dean while beating him evinces no more than the "neutral truth" that Dean in fact did mess up, head-butting two officers in short order. Appellee's Br. 39. But we cannot say that a reasonable jury would be compelled, as a matter of law, to endorse that reading. A jury crediting Dean's account also might find that the alleged statements

24

evinced a different truth: that Jones was angry at Dean – justifiably so – and used force punitively, to retaliate for Dean's head-butts. Whether Sergeant Jones made the statements in question and, if so, what they say about his state of mind is for a fact-finder to resolve, and the district court erred in granting summary judgment in the face of direct evidence on which a jury could have relied to find malicious intent.

**B.**

Because we conclude that a reasonable jury could find that Officer Hobgood and Sergeant Jones violated Dean's Eighth Amendment rights, we – unlike the district court – must now consider whether the officers are nevertheless entitled to qualified immunity. Under the doctrine of qualified immunity, "a corrections officer who 'has violated a prisoner's constitutional right' is 'shielded from liability . . . if an objectively reasonable officer could have believed that his actions were lawful in light of clearly established law.'" *Brooks*, 924 F.3d at 118 (ellipsis in original) (quoting *Cox v. Quinn*, 828 F.3d 227, 238 (4th Cir. 2016)). The officers argue that because there is no published circuit precedent finding an Eighth Amendment violation where force is used shortly after an inmate has assaulted an officer, Dean's right to be free from Officer Hobgood's use of pepper spray or Sergeant Jones's blows was not "clearly established" at the time of the incidents in 2015. *See Meyers v. Baltimore County*, 713 F.3d 723, 731 (4th Cir. 2013). For two reasons, we disagree.

First, it was clearly established in 2015 – and for many years before that – that inmates have a right to be free from pain inflicted maliciously and in order to cause harm, rather than in a good-faith effort to protect officer safety or prison order. *See*, *e.g.*, *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *Whitley*, 475 U.S. at 320–21; *see also Thompson*, 878

25

F.3d at 102 (discussing long-standing precedent establishing this principle). And our case law long has made clear that correctional officers cross this line when they use force to punish an inmate for prior misconduct or intransigence. *See*, *e.g.*, *Williams*, 77 F.3d at 765; *Iko*, 535 F.3d at 239–40; *see also Brooks*, 924 F.3d at 113–14 (discussing precedent). So assuming – as we do, for purposes of this alternative argument – that the officers here acted with a wrongful and punitive motive, then they violated clearly established Eighth Amendment law.

And as we have explained before, that clearly established Eighth Amendment principle was enough by itself to put reasonable officers on "fair notice" that their use of force against Dean – assuming, again, that it was intended to retaliate against Dean for his head-butts and not to protect officer safety – would violate the Constitution. *Thompson*, 878 F.3d at 105; *see also Brooks*, 924 F.3d at 119. In this "unusual" qualified immunity context, we are "dealing with a constitutional violation that has 'wrongful intent' as an element." *Brooks*, 924 F.3d at 118 (quoting *Thompson*, 878 F.3d at 106). The case law, in other words, is "intent-specific," *Thompson*, 878 F.3d at 106, which means that liability turns not on the particular factual circumstances under which the officer acted – which may change from case to case as the precedent develops – but on whether the officer acts with a culpable state of mind. And because an officer necessarily will be familiar with his own mental state, he "reasonably should know" that he is violating the law if he acts with a prohibited motive. *Brooks*, 924 F.3d at 119; *see also Thompson*, 878 F.3d at 119 ("For claims where intent is an element, an official's state of mind is a reference point by which she can reasonably assess conformity to the law . . . .").

Second, even if the officers were entitled to some additional notice, we had explained before 2015, "at the appropriate level of specificity," *Thompson*, 878 F.3d at 102, that a correctional officer uses excessive force if he maliciously uses force against an inmate who has been subdued, even if force might have been justified to control the inmate only moments before. In *Iko*, for instance – decided in 2008 – we established that the use of pepper spray on a formerly non-compliant inmate could qualify as excessive force. *See* 535 F.3d at 239–40; *Boone*, 583 F. App'x. at 176 (describing *Iko*). In that case, correctional officers used pepper spray to "incapacitate" an inmate who refused to comply with their orders so that they safely could extract him from his cell. *Iko*, 535 F.3d at 232, 239 (internal quotation marks omitted). We agreed with the officers that an initial dispersal of pepper spray was warranted. But if the officers continued to use pepper spray *after* Iko was compliant and "the threat reasonably perceived" by the officers had "decreased" significantly – a question on which there was a genuine dispute of fact – then, we held, a reasonable jury could find that they had violated the Eighth Amendment. *Id.* at 239–40; *see Thompson*, 878 F.3d at 100 (describing *Iko*).

*Iko* is hardly an outlier. *See*, *e.g.*, *Cowart v. Erwin*, 837 F.3d 444, 449–50 (5th Cir. 2016) (holding that it was "clearly established" in 2009 that "officers may not use gratuitous force against a prisoner who has already been subdued" (internal quotation marks omitted)); *Thompson*, 878 F.3d at 104–05 (discussing additional cases). And it was enough to put officers on clear notice, in 2015, that the use of pepper spray – or kicks and punches, *see*, *e.g.*, *McMillian*, 503 U.S. at 4; *Thompson*, 878 F.3d at 102 (discussing cases) – against Dean after he had been fully subdued and no longer posed a risk to their safety

27

could give rise to an inference of "wanton punishment" in violation of the Eighth Amendment, even if force appropriately might have been used just a few seconds earlier. *Brooks*, 924 F.3d at 119–20 (alterations omitted) (applying *Iko* to repeated uses of taser).

The officers insist that *Iko* is not sufficiently on point, because in that case, the initial justification for the use of force was the enforcement of prison rules and not, as here, the protection of officer safety after Dean's two head-butts. But the point is precisely the same – once the justification for the use of force has expired, any additional force may be deemed "malicious" and hence unconstitutional – and it applies with "obvious clarity" whatever the original justification. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (citation omitted); *cf. Thompson*, 878 F.3d at 102 (holding that precedent involving force in one form – kicking and punching – puts officers on "fair warning" that application of force in a different form also may violate the Eighth Amendment). And in any event, the rationale for force in *Iko* was not as singularly focused on prison discipline as the officers suggest. Instead, the purported need to compel compliance with prison rules was intertwined with concerns for officer safety: Iko's refusal to obey orders to present his hands for cuffing posed a danger to the officers attempting to carry out a cell extraction. *See Iko*, 535 F.3d at 233 (discussing Iko's "alleged dangerousness"); *id.* at 239 (discussing need to "incapacitate" inmate before "committing staff" to the cell extraction procedure (internal quotation marks omitted)).

In sum, the officers here were on "fair notice" of Dean's right not to be subjected to force in the form of pepper spray or a beating if that force was deployed to retaliate against Dean after he was subdued, and not to protect officer safety. For that reason, the officers

28

cannot prevail on their alternative argument that they are entitled to summary judgment on qualified immunity grounds even if they violated Dean's Eighth Amendment rights.

## III.

For the foregoing reasons, we reverse the judgment of the district court granting summary judgment to the defendants and remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*